May it please the Court, Dave Keenan with Warwick, Carrington, and Sutcliffe, and with me this morning is my co-counsel Jeff Cox. We represent the appellant, James Michael Warren. I'd like to reserve two minutes for rebuttal. Mr. Warren is asking this Court to reverse summary judgment, and there are a number of errors in the district court that support that request. But I'd like to first just briefly explain the prison policy that's at issue here, because it's a policy that prefers certain religions over others. Could I ask before you get there, just to clarify for my sake, there's a brief hint in the filings that the policy was going to change or may have changed. So in your comments, could you just clarify for me, you're talking about the policy that was in existence at the time, and is it still in existence? So, Your Honor, there are two different policies, and there's only one that's at issue here today. I think Your Honor may be talking about the policy as it relates to medallions. No, I'm not. I think the change that they no longer permit. The question is, am I, I'll just be clear, there's an indication that the policy may have changed so that now no holy books may come in to prison. Is that news to you? You're looking physical. That would be news to me, Your Honor. Okay, all right. I thought I read something like that also in one of the briefs. Well, let us not interrupt your entire prepared remarks, and opposing counsel. Sure. Well, that's why I asked at the outset. But I can ask opposing counsel to address that, and if there's a need for a supplemental briefing, we can talk about that, too. Thank you, Your Honor. So I'll just explain the policy as Mr. Warren understands it to exist, which is that it prefers certain religions over others. And so when a prisoner is booked into the Montana state prison system, the prisoner is allowed to keep a copy of the prisoner's holy book. But it can't just be any holy book. It has to be a holy book that the prison has determined is the central holy book of a given religion. So, for example, for Christians or Muslims or Jewish inmates, they're allowed to keep the Bible, the Koran, or the Torah. By contrast, if the prison has determined that the religion does not have a central holy book, the book is not allowed. And that's exactly what happened with Mr. Warren. He's an Odinist. He worships the Norse god Odin. So when he was being booked into the prison, he was told he couldn't keep his book of Norse prayers and rituals because it was apparently the prison's subjective view that Odinism doesn't have a central holy book. And so that's the prison policy that's at issue here. But the case before this court really comes down to errors on the facts and on the law in the district court that should result in reversal. And I'd like to talk first about the constitutional claims because the district court's errors there cut short analysis that Mr. Warren was entitled to on really on three of his four claims. And the district court made a mistake in dealing with the constitutional claims. It found that because it could dispose of Mr. Warren's Arlupa claim, that is the Religious Land Use and Institutionalized Persons Act, it could just automatically dispose of the constitutional claims with no analysis at all. And that was error. And the first problem with the district court's logic was dealing with the differing levels of scrutiny between the constitutional claims and Arlupa. So the free exercise and equal protection claims would have called for rational basis scrutiny. The Arlupa claim would have called for strict scrutiny. And because the district court found against Mr. Warren on the Arlupa claim, it assumed that it didn't need to look at the constitutional claims because, after all, if the policy can pass strict scrutiny, it can certainly pass rational basis scrutiny. But the error arises because the district court never reached the strict scrutiny analysis when it looked at Arlupa. And this is not really contested, is it, in the briefing? Well, Your Honor, the State of Montana, I think, concedes that we've identified a flaw in the district court's reasoning. I'm not sure that they concede that it was an error that should result in reversal. Well, yes. When I said it's not contested, I mean the flaw. Because the court didn't reach the strict scrutiny test, right? It relied on the substantial burden. That's correct. Yeah. Okay. And so can I ask, I just have a question about substantial burden. And my understanding on this point is that the district court was of the view that your client was claiming that there was a substantial burden because he wanted his copy of the book. And then the district court felt that this was not a substantial burden because it felt the record was adequate in demonstrating that your client could get a different copy of the book. So it seems to me that there may be questions about a fact either way, about whether or not your client could really get the book, whether he could afford it, whether it was available at the canteen, whether it was available at the library and whatnot. So I don't mean to get off into that. I'm just trying to figure out where this idea came from that the problem, that the claim was really that your client wanted his own personal copy of the book. Well, I think there are a couple of things that Mr. Warren said about that. He did want his personal copy of the book. But the issue really on the Arlupa claim was whether or not ultimately he could get any copy of the book once he had to give it up during the intake process. Okay. So is his claim that he wants his personal copy or just any copy? His claim is that he wants his personal copy. The district court really treated this in two ways. They looked at the personal copy issue. The district court looked at the personal copy issue. But really what allowed the district court to reach the result that it did was its finding that Mr. Warren could somehow still get a copy of the book. And it's Mr. Warren's argument that that was a genuine issue of material fact. It should have precluded summary judgment. This was Officer Wyatt's motion. And the key question was whether or not Mr. Warren could get a copy of the book, whether it was his personal copy or another copy. The only way to do that once he had to give it up would be to order it from an approved prison vendor. And that's assuming it was even available. And there's nothing in the record to suggest that it was. And Mr. Warren argued, and this is backed by documentation in the record, that he was indigent, that he could not get another book. Officer Wyatt argued, and the district court agreed with no support in the record, that Mr. Warren could get another book and had simply chosen not to. And the district court and the magistrate judge both seemed pretty clear in their orders that they were putting the burden on Mr. Warren. So just reading from the record, the district court found, and this is at ER 3, that Warren does not deny he can order religious books from the canteen. The problem is he did deny that. He said that he was indigent. What about the issue raised about the mootness in terms of his transfer to another facility? Thank you, Your Honor. So that relates to the early dismissal of the state officials. And the district court erred there when it found that prospective relief was no longer available once he was transferred. And the issue is this policy applies system-wide. So once it was applied to Mr. Warren at the intake process and he had to give up his book, it's not as if when he was sent off to the prison where he would do the balance of his time that he could somehow get the book back or there was a different policy. So the district court did err there by finding that prospective relief was no longer available against the state officials in their official capacity. And it's Mr. Warren's argument that these are the policy makers, and this policy is set up to confer or deny a privilege to prisoners based on their religion, and that these policy makers from the supervisor on down belong back in the case. Mr. Keenan, I don't know if you wanted to do rebuttal argument, but if you want to sharpen some of your arguments against what the appellee says, you should probably save some time. That sounds like a good idea, Your Honor. I'll do that. Thank you. Thank you. Police to court. I'm Ira Aiken, appearing on behalf of Defendant Chris Wyatt. Seated at the council table with me is Co-Counsel Mackenzie McCarthy. Your Honors, the district court did not err when it granted summary judgment in favor of Officer Wyatt because Mr. Warren did not state sufficient facts to establish a factual predicate that taking his book, taking up the runes, created a substantial burden on his ability to practice his onus religion. Counsel, has the policy changed? Yes, Your Honor, the policy has changed. The new policy can be found online. It's a public record. And the policy now is that no books at all are allowed into intake at Montana State Prison. I can see where that might moot some of these claims, and I guess we're going to need to talk about that. But how does it change the free exercise over LUPA claims? Your Honor, one of the things that I think might be somewhat misunderstood in this case is that the March Diagnostic Intake Unit is the one central intake unit for the entire Montana State Prison system. So it in and of itself is a separate facility. It is located on the Montana State Prison grounds, but it's a separate building and a separate facility. And people coming in there are coming in there from all over the state of Montana, primarily from county jails, but some from the outside. And that is their initial, if you want to call it Ellis Island, into the Montana State Prison system. So it's a smaller unit, and we're dealing with a place where we're going to be directing traffic from the intake unit. Forgive me for interrupting, but does this go to your argument that the state has a compelling interest to prevent the introduction of contraband? It does, and it also goes to the compelling state interest to control the amount of property coming in because of the resources it takes to move property from the intake unit to wherever that prisoner is going to be sent. Okay, so I can understand why there's a really important state interest there, but in terms of getting back to this suit that we're talking about, you're really arguing the balancing test. You're really arguing that the strict scrutiny is satisfied here. Don't we need to remand on that? I don't believe you do because I believe the factual basis for that has been established in the record. So is it your position then to just finish that thought, make sure I'm with you because this argument seems to be a little fluid today with all of the moving parts, but I'm understanding you to be recognizing the question wasn't resolved by the district court, but asking us to make the decision in the first instance. I believe the court could find that the district court did address the issue by implication. If the court chose not to find that or disagreed with that assessment, I believe the court could still address the issue based on the record. Turning to Mr. Warren's substantial burden argument, he didn't say that he couldn't practice his Odinist religion without this particular book. He didn't say he couldn't say his prayers without this particular book. He didn't say he couldn't share his religious experience with others without this particular book. He said he used this particular book in his daily prayers and in sharing his religion with others, and then he said that we had placed a substantial burden on that practice by refusing to allow him to have the book. By saying that we placed a substantial burden on him is nothing more than asserting a legal conclusion. Therefore, we believe the district court was correct when it found that simply saying that he used the book did not constitute a sufficient factual basis to support that a substantial burden had been placed on his exercise. Counsel, I would tend to agree that just saying it doesn't make a substantial burden, so maybe a legal conclusion. But, I mean, why should we not consider it a substantial burden if the state does not contest his sincerity, and he says, I use this, I read this every day to say my prayers, and I use this to confer with other people about my religion. Why should that not be considered a significantly great burden? Well, we don't contest, the state doesn't contest that he is a sincere Odinist. It would be, my analogy would be, I can be a sincere anything, and then I can say I read Chicken Soup for the Soul. That doesn't make my failure to have a copy of Chicken Soup for the Soul a substantial burden on my practice. So I think that there is a distinction. But it's based on his belief and his use, isn't it? And if he's saying that he needs it to say his prayers and so forth, I mean, how does he, do you mean to say, then, it's sort of a matter of including words saying, I can't memorize them, I need to have this essentially to practice? Yes. He did not say, for instance, that he could not engage in his prayers. He did not say that he could not engage in interaction with other Odinists. He said he uses it in his prayers and in his interactions. But couldn't the same be said for any religion that has a holy book? So isn't that necessarily a reasonable inference from his declaration? Well, Warren's allegations, in Wyant's opinion, amount to nothing more than him saying that he could use this book in the practice of his religion. And prisons, I don't believe. He never said that failure to have the book rendered his ability to practice his religion or to exercise it rendered that impractical, impossible. And people can claim that they need a lot of things to engage in a religious activity, but the law doesn't require prisons to permit possession of every aid in an inmate's religious exercise. It only prohibits placing a substantial burden on the exercise. So really no holy books would be necessary then. Christians can pray without a Bible. So how is that different? I think that's Judge Kobayashi's question. Well, that kind of goes to the genesis of this particular policy in the first instance. The prison, first of all, I might just point out that the law relating to our LUPA has been evolving since about 2000. That the courts, I believe, have shifted the analysis in this area from central tenets of a religion to central beliefs of an individual. That this goes back to 2008 and 2009 and the prison was trying to address our LUPA and at that time still trying to address it in the context of central to a particular religion. The religious activities coordinator determined that some religions are book-based and some are ground-based. And that certain religions have texts that are central holy texts for that specific religion and others don't. And so to try to not violate our LUPA, the decision was made to allow those to have that central holy book. So let me just understand, you're saying then for substantial burden test, it's an objective, not a subjective. In other words, if someone says, I have a sincere belief in X religion and this is the writings of X religion and it's necessary or I need it for my prayers and to relate my religion to others, that's not enough to show substantial burden. They have to meet this objective test? Well, ultimately I believe it would be a question of fact. But on a motion for summary judgment, once the moving party has established a lack of factual basis for an allegation that forms an element of the cause of action, the burden shifts back to the, in this case, plaintiff who bears the burden of proof in the first instance anyway to come forward with more facts. Right. Counsel, so to answer the question, because I think you're getting to it, I think it's your position, if I'm understanding correctly, that Mr. Moran didn't come forward with sufficient evidence to show that this book is central to the religion as opposed to being central to his personal practice of the religion. Is that the answer to Judge Kobayashi's question? That's correct. Okay. I haven't, if I could, you're almost out of time, but I think it's important for me to make sure I'm understanding the differences between the old policy and the new policy, if I could just quickly. My understanding is under the policy as it existed at the time, Mr. Moran's complaining about it, that the policy was that prisoners coming through intake could only bring in one of the three texts that you have mentioned. Other holy books were not allowed because of the concern about contraband. But that once he was inside the prison, if he had obtained a copy of this book through the library or commissary or a family friend or something, he could keep it in prison. Is that right? That's correct. Okay. Under the new policy, just quickly, no holy books are allowed through intake. That's correct. But my question then, sir, is if he obtained a copy of this book while he was in prison, can he keep it under the new policy in prison? Yes. Okay. Thank you for that clarification. I believe my time is up. Thank you, Your Honor. Thank you for your patience. Thank you very much. We thank the State. Mr. Keenan. Just two quick points on rebuttal. I'd like to address the questions that the Court had about our LUPA because I think this gets at another error in the District Court's analysis, and that is that the District Court defined a religious exercise too broadly. So what I mean by that is that the District Court started in the wrong place and it ended in the wrong place. And I think Judge Kobayashi's question was getting at this, that the test is a religious exercise is any exercise of religion regardless of whether it is compelled or central to a belief system, and that comes from the war soldier case in this circuit. So once the District Court determined that this belief was sincerely held, it should have just asked then, was that exercise of substantially burdened? It should not have gotten into the tricky business that I think the State of Montana has gotten into, which was sort of weighing just how important this particular book was to Mr. Warren's faith. I'd also like to just quickly address the compelling governmental interests. The State of Montana advances two interests, neither one of which were served by the policy. Regarding the amount of property in an inmate's cell, the prison system's policy is that, at least it was at the time, that a prisoner can have 15 books in the prisoner's cell. And the book that would come in through the intake, for example, the Bible, the Torah, the Koran, would count towards that number. And so the State of Montana agrees that Mr. Warren could have in theory ordered another book once he got inside of the prison. And so, in reality, the policy has no net effect on the number of books that are in the prisoner's cell. And then the second issue is this argument regarding contraband. There's certainly nothing in the record that suggests that the Bible, the Torah, or the Koran are somehow less suitable for smuggling contraband, for example, than an Odinist holy text. For these reasons, Mr. Warren asks that this court reverse, send the case back to the district court with further direction that he be appointed pro bono counsel and remand. Thank you. I have one question for you, if you could hold on. Assuming that the policy has changed in the way that the State described an argument, how does that affect your claims and the relief that you seek? Your Honor, the claims for prospective relief against the officials in their official capacity I think would be moot. The claims for damages would probably still be alive. Okay, thank you. Thank you. We thank both the appellant and appellee for excellent arguments, and we'll give an extra thank you to Mr. Keenan for appearing pro bono to help the court. Okay, well, thanks. Thank you very much. I should also say we'll give an extra thanks to Montana Council for traveling so far to help us. You're welcome, Your Honor. Thank you. Thank you all. That case shall be submitted.
judges: Kobayashi, Gould, Christen